UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

THOMAS MITCHELL, through his
Guardian, JOHN MITCHELL

              Plaintiffs,

v.                                                         Case Number 16-11605
                                                           Honorable David M. Lawson
COMMUNITY MENTAL HEALTH OF                                 Magistrate Judge Patricia T. Morris
CENTRAL MICHIGAN, MICHIGAN
DEPARTMENT OF HEALTH AND HUMAN
SERVICES, NICK LYON, and GOVERNOR
RICK SNYDER,

              Defendants.
_____/

JACOB HARTSHORNE, through his
Guardians, NANCY and THOMAS
HARTCHORNE,

              Plaintiffs,

v.                                                         Case Number 16-11607
                                                           Honorable David M. Lawson
COMMUNITY MENTAL HEALTH OF                                 Magistrate Judge Patricia T. Morris
CENTRAL MICHIGAN, MICHIGAN
DEPARTMENT OF HEALTH AND HUMAN
SERVICES, NICK LYON, and GOVERNOR
RICK SNYDER,

              Defendants.
_____/

## OPINION AND ORDER DENYING MOTIONS FOR PRELIMINARY INJUNCTION AND MOTIONS TO DISMISS

These two lawsuits were filed on behalf of two developmentally disabled individuals,

Thomas Mitchell and Jacob Hartshorne, who had been receiving in-home Community Living

Support (CLS) services through the Michigan Department of Health and Human Services (HHS),

administered by a local contract provider, defendant Community Mental Health of Central Michigan (CMHCM). Although the plaintiffs had been receiving 24-hour care, CMHCM reduced the level of covered services furnished to them by eliminating payment for supervisory care while they slept. The change, says CMHCM, was provoked by an internal audit by a newly-employed "Utilization Manager" that disclosed that CMHCM was authorized to furnish CLS services only for face-to-face time with the client and could not be used during periods when the client was asleep. That new interpretation resulted in the service reduction, despite no changes in the law or the plaintiffs' medical status.

The plaintiffs allege in their complaints that the manner in which CMHCM reduced CLS services violated their right to procedural due process in violation of the Fourteenth Amendment, and it amounts to discrimination under the Americans with Disabilities Act and the Rehabilitation Act. Both plaintiffs filed motions for a preliminary injunction, and the defendants filed motions to dismiss. The two cases were consolidated before this Court for adjudication of the motions.

After the motions were argued, the Mitchells sought relief again in an administrative appeal, this time successfully, at least for their claim going forward. The Administrative Tribunal ordered CMHCM to provide Medicaid-covered CLS services to Thomas Mitchell, even when he is sleeping. The Mitchells' motion for a preliminary injunction, therefore, is moot, as it seeks only prospective relief.

The Hartshornes have not sought any additional relief from the state. However, there is no requirement that the plaintiffs must exhaust administrative remedies before baring their claims under 42 U.S.C. § 1983 for violation of their rights to procedural due process or for violations of the ADA or the Rehabilitation Act. Because they have stated viable claims under those statutes, the Court will

-2-

deny the motions to dismiss.  The Hartshornes have alleged in their motion for a preliminary injunction that they will suffer irreparable harm if the supervisory care during sleep hours is eliminated.  However, that care continues, albeit at the plaintiff's expense, and, judging from the Mitchells' experience, it appears that the care could be restored if they pursued their administrative remedies.  Therefore, the Court will deny the motion for preliminary injunction because they have not demonstrated irreparable harm adequately.

## I.  Facts

These cases were filed in the Northern Division of this Court and were subsequently reassigned to judges in the Southern Division for docket management.  At the time of the reassignment, each case had two motions to dismiss and a preliminary injunction motion pending and fully briefed.  Because the issues in the pending motions were substantially similar, it was decided that *Hartshorne v. Community Mental Health of Central Michigan*, Case No. 16-11607, would be reassigned temporarily to the undersigned for the purpose of hearing and deciding motions filed by the parties under Rule 12(b) and Rule 65 of the Federal Rules of Civil Procedure.

The respective plaintiffs, Thomas Mitchell and Jacob Hartshorne, are two individuals suffering from various forms of developmental disabilities. They both were receiving in-home healthcare under Michigan's Medicaid CLS program until 2015 through defendant HHS. Defendant Rick Snyder, as governor, oversees all departments in Michigan, and defendant Nick Lyons is the director of HHS (collectively "State defendants").  The Medicaid services in the plaintiffs' region are administered by defendant CMHCM.  The plaintiffs' services were reduced, omitting nighttime coverage while they are sleeping.

After the plaintiffs' services were reduced, their guardians each filed requests for administrative hearings challenging the reductions. Mitchell had a full hearing and received a written decision by an Administrative Law Judge finding that the reduction of services was appropriate. Hartshorne withdrew his request the day before his hearing in order to pursue federal claims. The ALJ dismissed the action for failure to appear at the hearing.

The plaintiffs filed substantially similar three-count complaints alleging a violation of their right to procedural due process under the Fourteenth Amendment via 42 U.S.C. § 1983(Count 1); disability discrimination in violation of Title II of the ADA (Count 2); and violation of the Rehabilitation Act (Count 3).

## A.  Medicaid and CLS Services

Medicaid is a federal program that subsidizes state medical services furnished to, among others, "disabled individuals, whose income and resources are insufficient to meet the costs of necessary medical services." 42 U.S.C. § 1396-1. The plaintiffs in these related cases are adults with developmental disabilities who qualify for benefits under Medicaid. Under Medicaid, they are eligible for long-term institutional care. The Medicaid statute originally "reflected a congressional policy preference for treatment in the institution over treatment in the community." *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 601 (1999). Since 1981, however, "Medicaid has provided funding for state-run home and community-based care through a waiver program." *Id.* at 601(citing 42 U.S.C. § 1396n(c)). Through that program, Congress recognized that allowing individuals with disabilities to reside in a community setting can both save money and improve care. *See Price v. Medicaid Dir.*, 838 F.3d 739, 742-43 (6th Cir. 2016). The plaintiffs' CLS services were authorized

-4-

under a Medicaid waiver program. *See* Michigan's Medicaid Provider Manual at 102. They have chosen to live with their respective families in a community setting.

The State of Michigan, through HHS, provides mental health services to qualified individuals. Defendant CMHCM is under contract with HHS to provide Medicaid-covered services to people who reside in a specified service area. As part of the plaintiffs' Habilitation Supports Waiver Program, they received CLS services, which the plaintiffs allege included medically necessary supervisory care at night while the plaintiffs slept. Mitchell received the nighttime supervision for approximately seven months, and Hartshorne received the services for approximately five years. In the summer of 2015, the plaintiffs' CLS services were reduced by eliminating the nighttime supervisory care.

The plaintiffs contend that the reduction of services was erroneous because CLS services are intended to increase or maintain personal self-sufficiency, facilitating an individual's achievement of his goals of community inclusion and participation, independence or productivity. The defendants contend that they had misinterpreted their Medicaid Service Provider Manual, and that their actions amounted to a correction, as CLS is available only for face-to-face encounters, which excludes sleep time. They reason that the purpose of CLS is not to furnish supervision, but to assist in skill development. CLS cannot be provided when a client is asleep, they say, because there would be no training or learning component.

## B. Thomas Mitchell

Plaintiff Thomas Mitchell is a 30-year-old Medicaid beneficiary with severe intellectual disabilities and a seizure disorder, who qualifies as a person with a developmental disability under Michigan Compiled Laws 330.1100a(25). Mitchell alleges that he moved from a licensed adult

foster care home in August 2014 to his own apartment in the lower level of his father's Mount Pleasant, Michigan home. On March 6, 2015, Thomas's father met with CMHCM's case manager, Lorraine Crawford, who informed him that CMHCM would no longer pay for any CLS services while Thomas was asleep at night. The Mitchells allege that at no time did CMHCM send a termination notice of the CLS nighttime supervision to them, detailing the reasons for the change in coverage, as required by law.

The Mitchells' complaint does not make clear whether the notice was not provided at all or was merely deficient. It appears that CMHCM understood the plaintiffs' allegation to mean there was no notice whatsoever. Therefore, rather than responding to an allegedly deficient notice, CMHCM responded by attaching to its motion a March 6, 2015 Action Notice that it asserts Mitchell received at a meeting on that same day. CMHCM does not discuss the adequacy of the Action Notice.

The Action Notice, in part, says the following:

> *This is to notify you that* CMH for Central Michigan *has made the following decision(s) about the service(s) you have asked for or the service(s) you get from us. This does not mean that you will lose your Medicaid and will* **not** *affect other Medicaid services you are receiving, or may need in the future.*
> **The Action we have take is:**
> The service(s) you requested will be Authorized per your revised Individual Plan of Service. H2015 - Comprehensive Community Support Services T2002 - Non-emergency Transportation; per diem T1016 - Supports Coordination T2025 - Fiscal Intermediary Services T2036 - Therapeutic Camping, Overnight H2015 TT - Comprehensive Community Support Services H2014 TT - Skill Building & Training/ Out-of-Home Non-Vocational Habilitation (HAB).
>
> **Effective Date**: 3/6/2015
>
> **The reason for the Action is:**
> Other: Medicaid Provider Manual Community Living Supports section 15.1 CLS may be provided as a complement to, and in conjunction with, not to supplant home help.

Mitchell CMHCM MTD, dkt. #10, Ex. A, Action Notice (emphasis in original).  Additionally, the

Action Notice explained the plaintiff's rights should he disagree with the action taken.  It also

contains the following provision:

> **IMPORTANT NOTE:** If you file an appeal and/or a hearing you may ask your
> primary clinician or their supervisor that your services remain in place if you appeal
> within 12 calendar days of this notice, if the authorization has not expired, if the
> action is a reduction, termination, or suspension, and if the authorization was ordered
> by an authorized provider.  If services remain in place, you may have to repay the
> cost of these services if the hearing or appeal upholds the decision, if you withdraw
> your appeal or hearing request, or if you or your representative does not attend the
> hearing.

*Ibid*.

After the date of the Action Notice, the Mitchells learned, although they do not say how, that

the reason for the reduction of CLS services was because CMHCM had interpreted the CLS

provisions to exclude supervisory care provided to consumers while they sleep.  The plaintiff alleges

that this new interpretation of the CLS services occurred despite there being no changes in the law

and no changes in Thomas's medical status.  Nor were there any changes in Michigan's Habilitation

Supports Waiver or the Michigan Medicaid Provider Manual.  The plaintiffs contest the defendants'

interpretation and alleges that CMH's Pre-Paid Inpatient Health Plan codes expressly provide for

consumer care while they sleep.  They also allege that without payment for the medically necessary

supervisory care while he sleeps, Thomas's condition will likely deteriorate and he will be in danger

of institutionalization, or of being placed into a more restrictive setting.

The Mitchells filed a request for a hearing before an administrative law judge (ALJ) through

the State of Michigan Administrative Hearing System for the Department of Health and Human

Services.  CMHCM furnished a transcript of the hearing as an exhibit to its motion to dismiss.

Although not part of the pleadings, the transcript discloses that, according to the ALJ, Thomas's

-7-

father received the Action Notice on March 6, 2015; he filled out a request for a hearing on March 9, 2015; filed it on March 16, 2015; and an in-person administrative hearing was held on July 30, 2015. The ALJ made a factual finding that on March 6, 2015, Thomas's guardian met with a CMHCM case manager to complete an addendum to Thomas's Person Centered Plan. At the meeting, Thomas's father was informed that the CLS hours had to be for face-to-face time with Thomas and could no longer be used during periods when Thomas was asleep. Following the meeting, Thomas's CLS hours were reduced from 97 hours per week to 80.73 hours per week. The sole issue before the ALJ was whether CMHCM properly reduced Thomas's CLS services and instructed his guardian that CLS could no longer be used while Thomas was sleeping.

During the July 30, 2015 hearing, Thomas's father testified that he had been informed months in advance that the use of CLS services while consumers were sleeping was going to be discontinued. He also testified that he was not informed that the CLS services could continue while an appeal was pending. The ALJ reviewed the CLS definitions and determined that allocation of CLS hours cannot be used while Thomas is asleep. The ALJ's decision concluded with the explanation that Thomas's father could appeal the ALJ's decision within 30 days. No such appeal was filed.

C. Jacob Hartshorne

Plaintiff Jacob Hartshorne is a 26-year-old Medicaid beneficiary who is blind, deaf, and has severe intellectual disabilities and qualifies as a person with a developmental disability under Michigan Compiled Laws § 330.1100a(25). Jacob's parents, Nancy and Timothy Hartshorne, were

appointed Jacob's plenary guardians on June 1, 2007. Jacob resides in his parents' home in Mount Pleasant, Michigan. He has been receiving CLS services since June 2010, which include medically necessary supervision at night due to his medical conditions.

In the summer of 2015, the Hartshornes allege, defendant CMHCM unilaterally reduced Jacob's CLS hours despite no change in Jacob's medical condition, no change in the law, and no change in Michigan's Habilitation Supports Waiver or the Michigan Medicaid Provider Manual. The Hartshornes allege that the effective date of the reduction of services was July 13, 2015. They likewise allege that the defendants did not send a termination notice of the CLS nighttime supervision to them detailing the reasons for the change in coverage, as required by law. Defendant CMHCM contends that the Hartshornes did in fact receive notice and attached to its motion to dismiss an Action Notice with an effective date of June 19, 2015, which includes a statement that the services would be extended until July 13, 2015. The plaintiff does not contest that the notice was received.

The Action Notice, in part, says the following:

*This is to notify you that* CMH for Central Michigan *has made the following decision(s) about the service(s) you have asked for or the service(s) you get from us. This does not mean that you will lose your Medicaid and will* **not** *affect other Medicaid services you are receiving, or may need in the future.*

**The Action we have take is:**
The service(s) you requested will be Authorized per your revised Individual Plan of Service. T1016 - Supports Coordination H2015 - Comprehensive Community Support Services H2015 - Comprehensive Community Support Services T2002 - Non-emergency Transportation; per diem T2025 - Fiscal Intermediary Services

**Effective Date**: 6/19/2015

**The reason for the Action is:**
Other: Extending authorizations and services up to the new PCP that is proposed to be held the week of July 13.

-9-

CMHCM Hartshorne MTD, dkt. 10, Ex. A, Action Notice (emphasis in original).  It also has the

following provision:

> **IMPORTANT NOTE:** If you file an appeal and/or a hearing you may ask your
> primary clinician or their supervisor that your services remain in place if you appeal
> within 12 calendar days of this notice, if the authorization has not expired, if the
> action is a reduction, termination, or suspension, and if the authorization was ordered
> by an authorized provider.  If services remain in place, you may have to repay the
> cost of these services if the hearing or appeal upholds the decision, if you withdraw
> your appeal or hearing request, or if you or your representative does not attend the
> hearing.

*Ibid.*

As in the Thomas' case, Jacob contends that CMHCM's own reporting codes indicate that

supervisory care while a consumer sleeps is allowed.  And the Hartshornes also allege that without

payment for the medically necessary supervisory care while he sleeps, Jacob's condition likely will

deteriorate and he will be in danger of institutionalization, or being placed into a more restrictive

setting.  They filed an administrative appeal on July 27, 2015, but subsequently withdrew it the day

before the hearing in order to pursue federal claims.  The following day the ALJ entered an order

of dismissal because the plaintiff did not appear for the hearing.  No further appeal was filed.

### D.  Proceedings

Both cases were filed on May 4, 2016.  On May 13, 2016, the plaintiffs in both cases filed

emergency motions for a temporary restraining order.  Judge Thomas Ludington in the Northern

Division denied the requests for a temporary restraining order, but allowed them to proceed as

motions for preliminary injunctions.

-10-

The core relief the plaintiffs are seeking is a reinstatement of their Medicaid benefits. They also seek a declaration that the defendants violated their rights under section 504 of the Rehabilitation Act and Title II of the ADA. Finally, they ask for attorney's fees, compensatory damages, and punitive or exemplary damages.

Defendant CMHCM filed a motion to dismiss in both cases, as did the State defendants. The Court heard oral argument last September. As noted earlier, however, the Mitchells sought relief via an administrative appeal following a planning meeting during which CMHCM reasserted its position that CLS services were not available while the client was asleep. The ALJ determined that the state's Medicaid Provider Manual (MPM) does not contain an express restriction against furnishing CLS services while a beneficiary is sleeping. Although acknowledging that the defined purpose of CLS suggests that the services be provided face-to-face while the beneficiary is awake, the MPM expressly authorizes CLS to be used for "preserving the health and safety of the individual in order that he/she may reside or be supported in the most integrated, independent community setting." ALJ Opn. at 16 [dkt. #29-2]. The ALJ noted that CLS services can be provided at any time of the day or night, a point that appeared to be uncontested. The focus, he wrote, should be not on whether the beneficiary is sleeping, but on "whether the services are medically necessary." *Id.* at 17. Finding that the Mitchells adequately demonstrated the medical need for CLS services while Thomas was sleeping, the ALJ concluded that CMHCM erred in denying the service and reversed its determination. The ALJ denied the Mitchells' request for reimbursement for the nighttime care they had paid for between the initial service reduction and the decision date.

## II.  Motion to Dismiss

In their motions, the defendants argue that all counts in both complaints should be dismissed. They contend that the plaintiffs may not proceed without first exhausting administrative remedies, their claims in this Court amount to an appeal of the ALJ's first decision in the Mitchell case and as such is barred by the *Rooker-Feldman* doctrine, and the claims for monetary relief is barred by the Eleventh Amendment.  In their responses to the preliminary injunction motions, the defendants also argue that the plaintiffs have not stated claims upon which the Court can grant relief.  The Court will address these arguments in the context of Federal Rule of Civil Procedure 12(b)(6).

"The purpose of Rule 12(b)(6) is to allow a defendant to test whether, as a matter of law, the plaintiff is entitled to legal relief if all the facts and allegations in the complaint are taken as true." *Rippy ex rel. Rippy v. Hattaway*, 270 F.3d 416, 419 (6th Cir. 2001) (citing *Mayer v. Mylod*, 988 F.2d 635, 638 (6th Cir. 1993)).  Under Rule 12(b)(6), the complaint is viewed in the light most favorable to the plaintiff, the allegations in the complaint are accepted as true, and all reasonable inferences are drawn in favor of the plaintiff.  *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008).  "[A] judge may not grant a Rule 12(b)(6) motion based on a disbelief of a complaint's factual allegations."  *Saglioccolo v. Eagle Ins. Co.*, 112 F.3d 226, 228-29 (6th Cir. 1997) (quoting *Columbia Nat'l Res., Inc. v. Tatum*, 58 F.3d 1101, 1109 (6th Cir. 1995)).  "However, while liberal, this standard of review does require more than the bare assertion of legal conclusions."  *Tatum*, 58 F.3d at 1109; *Tackett v. M & G Polymers, USA, L.L.C.*, 561 F.3d 478, 488 (6th Cir. 2009).  "To survive a motion to dismiss, [a plaintiff] must plead 'enough factual matter' that, when taken as true, 'state[s] a claim to relief that is plausible on its face.'  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556, 570 (2007).  Plausibility requires showing more than the 'sheer possibility' of relief but less than

a 'probab[le]' entitlement to relief. *Ashcroft v. Iqbal*, [556 U.S. 662, 678] (2009)." *Fabian v. Fulmer Helmets, Inc.*, 628 F.3d 278, 280 (6th Cir. 2010). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557).

Under the new regime ushered in by *Twombly* and *Iqbal*, pleaded facts must be accepted by the reviewing court but conclusions may not be unless they are plausibly supported by the pleaded facts. "[B]are assertions," such as those that "amount to nothing more than a 'formulaic recitation of the elements'" of a claim, can provide context to the factual allegations, but are insufficient to state a claim for relief and must be disregarded. *Iqbal*, 556 U.S. at 681 (quoting *Twombly*, 550 U.S. at 555). However, as long as a court can "'draw the reasonable inference that the defendant is liable for the misconduct alleged,' a plaintiff's claims must survive a motion to dismiss." *Fabian*, 628 F.3d at 281 (quoting *Iqbal*, 556 U.S. at 678).

Consideration of a motion to dismiss under Rule 12(b)(6) is confined to the pleadings. *Jones v. City of Cincinnati*, 521 F.3d 555, 562 (6th Cir. 2008). Assessment of the facial sufficiency of the complaint ordinarily must be undertaken without resort to matters outside the pleadings. *Wysocki v. Int'l Bus. Mach. Corp.*, 607 F.3d 1102, 1104 (6th Cir. 2010). However, "documents attached to the pleadings become part of the pleadings and may be considered on a motion to dismiss." *Commercial Money Ctr., Inc. v. Illinois Union Ins. Co.*, 508 F.3d 327, 335 (6th Cir. 2007) (citing Fed. R. Civ. P. 10(c)); *see also Koubriti v. Convertino*, 593 F.3d 459, 463 n.1 (6th Cir. 2010). Even if a document is not attached to a complaint or answer, "when a document is referred to in the pleadings and is integral to the claims, it may be considered without converting a motion to dismiss into one for summary judgment." *Commercial Money Ctr.*, 508 F.3d at 335-36. If the plaintiff does

-13-

not directly refer to a document in the pleadings, but that document governs the plaintiff's rights and is necessarily incorporated by reference, then the motion need not be converted to one for summary judgment. *Weiner v. Klais & Co., Inc.*, 108 F.3d 86, 89 (6th Cir. 1997) (holding that plan documents could be considered without converting the motion to one for summary judgment even though the complaint referred only to the "plan" and not its associated documents). In addition, "a court may consider matters of public record in deciding a motion to dismiss without converting the motion to one for summary judgment." *Northville Downs v. Granholm*, 622 F.3d 579 (6th Cir. 2010) (citing *Commercial Money Ctr., Inc.*, 508 F.3d at 335-36).

A. Exhaustion of Remedies

As described above, the plaintiffs had available to them a path through the state's administrative procedures to challenge the denial of benefits they sought on behalf of their disabled children. In fact, the Mitchells' dogged pursuit of that process eventually resulted in success on their claim, at least going forward. The defendants argue that the availability of those administrative procedures compels the plaintiffs to resort to them, and their failure to pursue them to the end bars their federal claims here.

The plaintiffs' federal claims are based on 42 U.S.C. § 1983, Title II of the Americans with Disabilities Act, and section 504 of the Rehabilitation Act. None of those statutes contains an exhaustion prerequisite. *Patsy v. Bd. of Regents of State of Fla.*, 457 U.S. 496, 516 (1982) ("[E]xhaustion of state administrative remedies [is not] required as a prerequisite to bringing an action pursuant to § 1983."); *Bogovich v. Sandoval*, 189 F.3d 999, 1002 (9th Cir. 1999) ("There is no exhaustion requirement for claims brought under Title II of the ADA."); *Smith v. Barton*, 914 F.2d 1330, 1338 (9th Cir. 1990) ("[P]rivate plaintiffs suing under section 504 [of the Rehabilitation

-14-

Act] need not first exhaust administrative remedies."); *see also Zimmerman v. Oregon Dep't of Justice*, 170 F.3d 1169, 1178 (9th Cir. 1999) (explaining that where Title I of the ADA is based on Title VII of the Civil Rights Act of 1964, which does contain exhaustion requirements, "Title II [of the ADA] incorporates the Rehabilitation Act's provisions, which do not require an employee to pursue any administrative relief").

In support of its argument, CMHCM cites *Fry v. Napoleon Community Schools*, 788 F.3d 622 (6th Cir. 2015), in which the Sixth Circuit held that the plaintiffs — a disabled child and her parents who sued a school district under the Americans with Disabilities Act and the Rehabilitation Act when school officials refused to allow the student to bring her service dog to school — were required to exhaust administrative remedies available under the Individuals with Disabilities in Education Act (IDEA). The court held that even when invoking other federal statutes in their lawsuits, "plaintiffs must exhaust IDEA procedures if they seek 'relief that is also available' under IDEA, even if they do not include IDEA claims in their complaint." 788 F.3d at 625 (citations omitted). CMHCM contends that the court's reasoning maps well onto the present case, because the relief the plaintiffs seek — reinstatement of the reduced CLS services — is "also available" under Michigan's Department of Health and Human Services administrative process.

However, the Supreme Court vacated the Sixth Circuit's *Fry* decision. *Fry v. Napoleon Cmty. Sch.*, --- U.S. ---, 137 S. Ct. 743 (2017). The Court held that the IDEA's exhaustion requirements do not apply unless a plaintiff's lawsuit in substance seeks the core relief provided by the IDEA, that is, a free and appropriate public education. If the substance of the complaint seeks that relief, then exhaustion is required, regardless of the label that the artful pleader might attach to the claim. 137 S. Ct. at 755-56. But just because the relief sought in a complaint might overlap with

-15-

such a statute, exhaustion does not thereby become required.  Courts also must look to the remedies that the statutes cited by a plaintiff invoke.  As the Court noted, "Title II of the ADA and § 504 of the Rehabilitation Act cover people with disabilities of all ages, and do so both inside and outside schools.  And those statutes aim to root out disability-based discrimination, enabling each covered person (sometimes by means of reasonable accommodations) to participate equally to all others in public facilities and federally funded programs."  *Id.* at 756.

In this case, the plaintiffs have not asked the Court to review the merits of the administrative decisions that reduced their Medicaid benefits.  Instead, they contend that the procedures used by the state did not comport with the requirements of the Due Process Clause, and the decisions discriminated against them under the ADA and the Rehabilitation Act.  They contend that regardless of how the defendants interpret the Medicaid Provider Manual, denying them nighttime CLS services violates their rights under those statutes.  There is no reason to engraft an exhaustion requirement onto those statutory causes of action.

The defendants also contend that the Michigan Administrative Procedures Act, Mich. Comp. Laws § 24.201 *et seq.*, bars the claims.  The defendants base this argument on *Womack-Scott v. Department of Corrections*, 246 Mich. App. 70, 630 N.W. 2d 650 (2001).  But that case discusses the procedural limitations on state statutory remedies and has no application to the federal claims that are the subject of the present complaints.

There is no exhaustion-of-remedies requirement that bars the plaintiffs' claims.

## B.  *Rooker-Feldman* Doctrine

The defendants also contend that the plaintiffs are in essence seeking review of the administrative decisions, which they argue is not permitted under the *Rooker-Feldman* doctrine.  The

-16-

plaintiffs disagree and argue that they do not seek review of the merits of the administrative decisions, but instead seek to press their due process and discrimination claims.

The *Rooker-Feldman* doctrine, named after the decisions in *Rooker v. Fidelity Trust Co.*, 263 U.S. 413 (1923), and *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462 (1983), prohibits federal courts below the United States Supreme Court from exercising "appellate jurisdiction over the decisions and/or proceedings of state courts, including claims that are 'inextricably intertwined' with issues decided in state court proceedings." *Exec. Arts Studio, Inc., v. City of Grand Rapids*, 391 F.3d 783, 793 (6th Cir. 2004) (citations omitted). The doctrine stands for the proposition that "the lower federal courts do not have jurisdiction 'over cases brought by "state-court losers" challenging "state-court judgments rendered before the district court proceedings commenced."'" *Raymond v. Moyer*, 501 F.3d 548, 550-51 (6th Cir. 2007) (quoting *Lance v. Dennis*, 546 U.S. 549, 460 (2006), and *Exxon Mobil Corp v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005)). The *Rooker-Feldman* doctrine is premised on the notion that only the Supreme Court has jurisdiction to review state court judgments. *See* 28 U.S.C. § 1257.

> The *Rooker-Feldman* doctrine, . . . is confined to cases of the kind from which the doctrine acquired its name: cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments. *Rooker-Feldman* does not otherwise override or supplant preclusion doctrine or augment the circumscribed doctrines that allow federal courts to stay or dismiss proceedings in deference to state-court actions.

*Exxon Mobil Corp.*, 544 U.S. at 284. "The inquiry then is the source of the injury the plaintiff alleges in the federal complaint." *McCormick v. Braverman*, 451 F.3d 382, 393 (6th Cir. 2006). "If the source of the injury is the state court decision, then the *Rooker-Feldman* doctrine would prevent

-17-

the district court from asserting jurisdiction. If there is some other source of injury, such as a third party's actions, then the plaintiff asserts an independent claim." *Ibid.*

The defendants rely on *Pappas v. Dazzo*, No. 12-12952, 2013 WL 2146711 (E.D. Mich. May 15, 2013) (J. Roberts), but that case offers them no help. In *Pappas*, the plaintiff's CLS services were terminated because the CLS protocol had been changed. *Id.* at *1. The plaintiff appealed his termination and was successful in having his services reinstated. *Ibid.* However, after a rehearing, the ALJ concluded that the tribunal did not have the authority to award attorney's fees and costs. *Ibid.* The plaintiff subsequently filed a multi-count complaint in federal district court, the first count seeking "review of the administrative hearing decision." *Ibid.* The district court found that count one was barred by the Michigan Administrative Procedures Act and the *Rooker-Feldman* doctrine, and the rest of the counts were barred by *res judicata*. The first count in the *Pappas* case is precisely the type of claim that the *Rooker-Feldman* doctrine is intended to address. The complaint said that the plaintiff was seeking review of the administrative decision.

Here, by contrast, the complaint alleges that the plaintiffs' injuries were caused by the discrimination resulting from CMHCM's reduction of CLS services, not the state administrative decisions. The specter that state court decisions and federal court decisions may overlap does not necessarily require courts to apply the *Rooker-Feldman* doctrine. *McCormick*, 451 F.3d at 395. The *Rooker-Feldman* doctrine applies only "when a plaintiff asserts before a federal district court that a state court judgment itself was unconstitutional or in violation of federal law." *Ibid.* Here, the plaintiffs allege that the defendants' actions caused their injury; the *Rooker-Feldman* doctrine does not apply.

-18-

C.  *Res Judicata*

The defendants argue that the doctrine of *res judicata* bars the plaintiffs' claims.  "Section 28 U.S.C. § 1738 generally requires 'federal courts to give preclusive effect to state-court judgments whenever the courts of the State from which the judgments emerged would do so.'"  *Haring v. Prosise*, 462 U.S. 306, 313 (1983) (quoting *Allen v. McCurry*, 449 U.S. 90, 96 (1980)).  This statute calls upon federal courts to apply the state's laws of issue preclusion and claim preclusion.

Under Michigan claim preclusion law, a subsequent action is barred when "(1) the prior action was decided on the merits, (2) both actions involve the same parties or their privies, and (3) the matter in the second case was, or could have been, resolved in the first."  *Washington v. Sinai Hosp. of Greater Detroit*, 478 Mich. 412, 418, 733 N.W. 2d 755, 759 (2007).  For issue preclusion to bar subsequent litigation, "'a question of fact essential to the judgment must have been actually litigated and determined by a valid and final judgment.  In addition, the same parties must have had a full opportunity to litigate the issue, and there must be mutuality of estoppel.'"  *Nummer v. Treasury Dep't*, 448 Mich. 534, 542, 533 N.W.2d 250, 253 (1995) (quoting *Storey v. Meijer, Inc.*, 431 Mich. 368, 373 n.3, 429 N.W.2d 169, 172 n.3 (1988)).  However, in Michigan, mutuality of estoppel is not required when claim preclusion is asserted defensively.  *Monat v. State Farm Ins. Co.*, 469 Mich. 679, 691, 677 N.W.2d 843, 850 (2004); *see also Gilbert v. Ferry*, 413 F.3d 578, 580-81 (6th Cir. 2005).  Issue and claim preclusion generally are questions of law.  *Stemler v. City of Florence*, 350 F.3d 578, 585 (6th Cir. 2003).  The party asserting preclusion bears the burden of proof.  *See Winget v. JP Morgan Chase Bank, N.A.*, 537 F.3d 565, 572 (6th Cir. 2008).

CMHCM argues that prior administrative decisions must be given preclusive effect.  The Sixth Circuit agrees.  *Herrera v. Churchill McGee, LLC*, 680 F.3d 539, 547 (6th Cir. 2012) (holding

that "'federal courts must give the agency's factfinding the same preclusive effect to which it would be entitled in the State's courts'") (quoting *Univ. of Tenn. v. Elliott*, 478 U.S. 788, 799 (1986)).   It is not clear how this helps CMHCM, however, because there are relatively few facts in dispute. There was no administrative decision in Hartshorne's case, and the ALJ's decision in Mitchell's case did not address the discrimination claims advanced here.

The State defendants argue that there is no question that all three criteria under Michigan law are met.  The administrative proceeding involved the same parties, the same subject matter, and at least in Mitchell's case, a determination on the merits.  However, the plaintiffs have alleged claims under the Due Process Clause and federal statutes, matters not within the ALJ's bailiwick.  The ALJ did not — and could not — resolve any of those claims on the merits.  Therefore, because the ALJ could not adjudicate the plaintiffs' rights under the ADA, the Rehabilitation Act, and the Due Process Clause, the defendants have failed to meet their burden that "the matter in the second case was, or could have been, resolved in the first."  *Washington*, 478 Mich. at 418, 733 N.W. 2d at 759.

## D.  Eleventh Amendment

The State defendants argue that they are immune from the plaintiff's claims under the Eleventh Amendment.

The Supreme Court has explained on a number of occasions that under the Eleventh Amendment, "an unconsenting State is immune from suits brought in federal courts by her own citizens as well as by citizens of another state."  *Employees v. Missouri Public Health & Welfare Dep't*, 411 U.S. 279, 280 (1973) (citing *Hans v. Louisiana*, 134 U.S. 1 (1890); *Duhne v. New Jersey*, 251 U.S. 311 (1920); and *Parden v. Terminal R. Co.*, 377 U.S. 184 (1964), *overruled on other grounds by Coll. Sav. Bank v. Florida Prepaid Post-Secondary Educ. Expense Bd.*, 527 U.S. 666,

-20-

676 (1999)).  And as to the scope of immunity afforded by the Amendment, the Court has declared "that in the absence of consent a suit in which the State or one of its agencies or departments is named as the defendant is proscribed by the Eleventh Amendment.  This jurisdictional bar applies regardless of the nature of the relief sought." *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100-01 (1984).

However, state sovereign immunity as recognized by the Eleventh Amendment does not extend to suits against state officials seeking to enjoin violations of federal law.  *Ex parte Young*, 209 U.S. 123, 159-160 (1908).  A plaintiff can "avoid[] this sovereign immunity bar by suing for injunctive or declaratory relief, rather than monetary relief." *Johnson v. Unknown Dellatifa*, 357 F.3d 539, 545 n.1 (6th Cir. 2004) (citing *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 n.10 (1989).  To determine whether a claim for such relief avoids sovereign immunity, "a court need only conduct 'a straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective.'" *Dubuc v. Michigan Bd. of Law Examiners*, 342 F.3d 610, 616 (6th Cir. 2003) (quoting *Verizon Maryland, Inc. v. Public Service Comm'n of Maryland*, 535 U.S. 635, 645 (2002)).

The complaints in these cases seek both declaratory and prospective injunctive relief. Therefore, the plaintiffs' claims against the State defendants in their official capacities for that relief survive an Eleventh Amendment challenge.

Moreover, Eleventh Amendment immunity for damages suits against States and state officials is not absolute.  Congress "may abrogate the states' Eleventh Amendment sovereign immunity." *Franks v. Kentucky Sch. for the Deaf*, 142 F.3d 360, 362 (6th Cir. 1998) (citing *Seminole Tribe v. Florida*, 517 U.S. 44, 56 (1996)).  "In *Seminole Tribe*, the Supreme Court

-21-

articulated a two-part test for determining whether Congress successfully abrogated the states' sovereign immunity with regard to a particular statute." *Ibid.* "The Court held that states retain their sovereign immunity unless (1) Congress unequivocally expressed its intent to abrogate the immunity, and (2) Congress acted pursuant to a valid exercise of power." *Ibid.* (citing *Seminole Tribe*, 517 U.S. at 55).

There is no dispute that Congress abrogated the Eleventh Amendment under the ADA. *See* 42 U.S.C. § 12202 ("A State shall not be immune under the eleventh amendment to the Constitution of the United States from an action in Federal or State court of competent jurisdiction for a violation of this chapter."). But the Supreme Court has held that "Congress's attempted abrogation is only valid in limited circumstances, depending upon the nature of the ADA claim." *Babcock v. Michigan*, 812 F.3d 531, 534 (6th Cir. 2016) (citing *Bd. of Trustees of Univ. of Alabama v. Garrett*, 531 U.S. 356, 374 (2001)). The Supreme Court set forth a three-part test to evaluate whether the Eleventh Amendment proscribes an ADA Title II claim. Courts must

> determine . . . on a claim-by-claim basis, (1) which aspects of the State's alleged conduct violated Title II; (2) to what extent such misconduct also violated the Fourteenth Amendment; and (3) insofar as such misconduct violated Title II but did not violate the Fourteenth Amendment, whether Congress's purported abrogation of sovereign immunity as to that class of conduct is nevertheless valid.

*United States v. Georgia*, 546 U.S. 151, 159 (2006).

The State defendants argue that the plaintiffs fail to meet the first two elements because they have not made any allegations that the State defendants denied them services due to their disabilities, and the plaintiffs have not identified a comparable Fourteenth Amendment right.

Title II of the ADA states that "no qualified individual with a disability shall, *by reason of such disability*, be excluded from participation in or be denied the benefits of the services, programs,

-22-

or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. §
12132 (emphasis added).  The State defendants correctly point out that the complaints lack any
allegations that the CLS services were reduced because of the plaintiffs' disabilities.  Instead, the
thrust of the plaintiffs' grievance is that the services were reduced because of a new interpretation
of the Medicaid Provider Manual, which is being applied universally.  Those allegations are not
sufficient to satisfy the first element of *United States v. Georgia*'s test.  Therefore, the plaintiffs'
Title II ADA claims for damages against the State defendants fail because they have not pleaded
around the Eleventh Amendment bar.

Congress also abrogated Eleventh Amendment immunity in the Rehabilitation Act, 42 U.S.C.
§ 2000d-7(a)(1) for violations of section 504.  The State defendants parrot their argument that the
plaintiffs have not stated a plausible claim under that Act.  However, the Rehabilitation Act differs
from ADA, in that it states explicitly that "[a] State shall not be immune under the Eleventh
Amendment of the Constitution of the United States from suit in Federal court for a violation of
section 504 of the Rehabilitation Act of 1973."  42 U.S.C. § 2000d-7(a)(1).  The Sixth Circuit held
that because of the unequivocal language of the Act, states "waive their Eleventh Amendment
immunity with regard to Rehabilitation Act claims when they accept federal funds."  *Nihiser v. Ohio
E.P.A.*, 269 F.3d 626, 628 (6th Cir. 2001); *cf. Westside Mothers v. Olszewski*, 454 F.3d 532, 535 (6th
Cir. 2006) ("Although participation in the [Medicaid] program is voluntary, participating States must
comply with certain requirements imposed by the Act and regulations promulgated by the Secretary
of Health and Human Services.").  Therefore, the Eleventh Amendment is not a bar to the plaintiffs'
claims under the Rehabilitation Act.

E.  Due Process Claim

In count I of the complaints, the plaintiffs allege via 42 U.S.C. § 1983 that the defendants violated their rights under the Due Process Clause to meaningful notice and an opportunity to be heard before their Medicaid benefits were reduced.  The defendants contend that the plaintiffs received Action Notices that outlined the benefit reductions, and they had the opportunity for a post-termination hearing before an ALJ.  Those procedures, the defendants say, satisfied due process.

In order to establish a procedural due process violation, the plaintiffs must show that they (1) had a life, liberty, or property interest protected by the Constitution; (2) was deprived of that interest by a state actor; and (3) was not afforded timely and adequate process under law.  *Waeschle v. Dragovic*, 576 F.3d 539, 544 (6th Cir. 2009).  The plaintiffs pleaded facts establishing the first two elements.  The focus of the defendants' motion is on whether the defendants afforded the plaintiffs the procedural process to which they were due.

The Fourteenth Amendment prohibits governmental actions which would deprive "any person of life, liberty or property without due process of law."  United States Const. amend. XIV.  "'The fundamental requisite of due process of law is the opportunity to be heard.'" *Goldberg v. Kelly*, 397 U.S. 254, 267 (1970), *Grannis v. Ordean*, 234 U.S. 385, 394 (1914).  "The hearing must be 'at a meaningful time and in a meaningful manner.'" *Ibid.* (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)).  The "recipient [must] have timely and adequate notice detailing the reasons for a   proposed termination, and an effective opportunity to defend by confronting any adverse witnesses and by presenting his own arguments and evidence orally."  *Id*. at 267-68 (1970).

Medicaid's hearing system must "meet the due process standards set forth in *Goldberg v. Kelly*, 397 U.S. 254 (1970), and any additional standards specified in this subpart."  42 C.F.R. §

-24-

431.205(d).  The State is required to provide notice to a Medicaid recipient whenever there is "any action affecting his or her claim."  42 C.F.R. § 431.206(c)(2).  An action "means a termination, suspension, or reduction of Medicaid eligibility or covered services."  42 C.F.R. § 431.201.  Except for certain narrow exceptions not at issue in this case, "[t]he State or local agency must send a notice at least 10 days before the date of action."  42 C.F.R. § 431.211; *see also id.* §§ 431.213, 431.214.  The notice must say what action the State is taking, 42 C.F.R. § 431.210(a), "[t]he reasons for the intended action," § 431.210(b), and the relevant law that supports the action, § 431.210(c), and the individual's right to a hearing,  § 431.210(d).

The notices sent to the Mitchells and the Hartshornes were not attached to the complaint, but they are referenced and are central to the claims.  Therefore, the Court will consider them as part of the material allowed under Rule 12(b)(6).  *Commercial Money Ctr.*, 508 F.3d at 335-36.  Those notices, quoted earlier, are opaque, perhaps even indecipherable.  They do not give any indication to the average person of an intention to reduce Medicaid benefits or the reason for the planned action.  *Goldberg* and the regulations require a level of detail absent in the Action Notices.  397 U.S. at 267-68.  The Action Notices merely list codes under the actions taken section, and the reasons for the actions taken are single sentences that appear to be unrelated to the reasons for the reduction of services.  And the Mitchells' notice was tendered on the day the benefit reduction was to go into effect.  The complaints adequately plead a due process violation.

The State defendants insist, however, that the administrative appeal process furnishes all the process the plaintiffs are due, and therefore no deprivation can be shown.  They rely primarily on *Jefferson v. Jefferson City Public School System*, in which the Sixth Circuit held that "[i]f satisfactory state procedures are provided in a procedural due process case, then no constitutional

-25-

deprivation has occurred despite the injury." 360 F.3d 583, 587-88 (6th Cir. 2004). But *Jefferson* deals with a type of pre-deprivation due process claim that does not apply in the present cases. *Jefferson* is based on *Parratt v. Taylor*, 451 U.S. 527 (1981), in which the Supreme Court considered a claim by a prisoner against a prison official under section 1983 for negligently losing his mail-order hobby materials. *Id.* at 529. The Court held that no due process violation occurred, even though the prisoner was deprived of property by a state actor, because "the deprivation did not occur as a result of some established state procedure." *Id.* at 529. When the deprivation occurs because of a state actor's negligence, pre-deprivation procedures (or the lack of them) are irrelevant, and a due process violation cannot be established if the post-deprivation procedures are adequate. That is because "[a] negligent loss of property 'is not a result of some established state procedure and the State cannot predict precisely when the loss will occur.'" *Mitchell v. Fankhauser*, 375 F.3d 477, 481 (6th Cir. 2004) (quoting *Parratt*, 451 U.S. at 543).

Here, however, the plaintiffs allege, unlike in *Jefferson*, that the State's established procedure failed to satisfy the requirement of furnishing proper and understandable notice. They have not alleged that the faulty notice was the result of negligence or a rogue bureaucrat. Unless the plaintiffs were deprived of a property interest as the result of " a random or unauthorized act," the plaintiffs are required "'neither to plead nor prove the inadequacy of post-termination state-law remedies in order to prevail.'" *Mitchell*, 375 F.3d at 484 (quoting *Moore v. Bd. of Educ. of Johnson City Sch.*, 134 F.3d 781, 785 (6th Cir. 1998). The plaintiffs are not required to plead the inadequacy of state-law post-deprivation remedies in order to state a claim.

It is true that "the requirements of due process are fluid and fact dependent," *Shoemaker v. City of Howell*, 795 F.3d 553, 559 (6th Cir. 2015) (citing *Mathews v. Eldridge*, 424 U.S. 319, 334

(1976)), and that "the sufficiency of predeprivation procedures must be considered in conjunction with the options for postdeprivation review; if elaborate procedures for postdeprivation review are in place, less elaborate predeprivation process may be required," *ibid.* (quoting *Leary v. Daeschner*, 228 F.3d 729, 742–43 (6th Cir. 2000)). That truism may spell trouble for the plaintiffs' success on this count, given the nature of the administrative appeal process and the Mitchells' ultimate success in the administrative forum. But for now, it need only be said that the complaints plead sufficient facts to survive the motion to dismiss the due process claim.

### F.  ADA Claim

In Title II of the ADA, Congress declared that, "[s]ubject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Although perhaps not stated clearly as it could be, the plaintiffs' claim of discrimination under the ADA is based on the Supreme Court's discussion in *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581 (1999), of this statute's command with respect to institutionalized persons, and the Attorney General's implementing regulations. The plaintiffs allege that the defendants' failure to continue nighttime CLS services for Thomas and Jacob, when nighttime services are available to others, creates a danger that they may have to be sent to an institution or another, more restrictive setting.

This claim finds support on the statutes and regulations. In the preamble to the Title II regulations, "the Attorney General concluded that unjustified placement or retention of persons in institutions, severely limiting their exposure to the outside community, constitutes a form of discrimination based on disability prohibited by Title II." *Olmstead*, 527 U.S. at 596 (citing 28

-27-

C.F.R. § 35.130(d)). To that end, the "reasonable-modification regulation" states that "[a] public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7)(i); *Olmstead*, 527 U.S. at 592.

In *Olmstead*, the Supreme Court observed that the Attorney General's recognition that institutionalization can be a form of discrimination "reflects two evident judgments." *Olmstead*, 527 U.S. at 596. First, "the Attorney General concluded that unjustified placement or retention of persons in institutions, severely limiting their exposure to the outside community, constitutes a form of discrimination based on disability prohibited by Title II." *Ibid*. Second, "the Attorney General provided that States could resist modifications that 'would fundamentally alter the nature of the service, program, or activity.'" *Id*. at 597. The Supreme Court agreed and held that unjustified isolation "is properly regarded as discrimination based on disability. But [the Court] recognize[d], as well, the States' need to maintain a range of facilities for the care and treatment of persons with diverse mental disabilities, and the States' obligation to administer services with an even hand." *Ibid*.

Following the *Olmstead* decision, the "DOJ announced its view that the disability discrimination claim recognized in *Olmstead* is not limited to individuals already subject to unjustified isolation, but also 'extend[s] to persons at serious risk of institutionalization or segregation.'" *Davis v. Shah*, 821 F.3d 231, 262 (2d Cir. 2016) (quoting U.S. Dep't of Justice, Statement of the Department of Justice on Enforcement of the Integration Mandate of Title II of the Americans with Disabilities Act and *Olmstead v. L.C.*, Q. 6 (last updated June 22, 2011), *available*

-28-

*at* www.ada.gov/olmstead/q&a_olmstead.htm).  As the DOJ explained, "a plaintiff 'need not wait until the harm of institutionalization or segregation occurs or is imminent' in order to bring a claim under the ADA."  *Ibid*.  "Rather, a plaintiff establishes a 'sufficient risk of institutionalization to make out an *Olmstead* violation if a public entity's failure to provide community services . . . will *likely* cause a decline in health, safety, or welfare that would lead to the individual's eventual placement in an institution.'"  *Id*. at 262-63 (emphasis in original); *see also Pashby*, 709 F.3d at 322 (4th Cir. 2013) (holding that plaintiffs may raise successful ADA and Rehabilitation Act claims "because they face a risk of institutionalization"); *M.R. v. Dreyfus*, 697 F.3d 706, 720 (9th Cir. 2012) (recognizing violation where plaintiffs established that "reduced access to personal care services will place them at serious risk of institutionalization"); *Radaszewski ex rel. Radaszewski v. Maram*, 383 F.3d 599, 608 (7th Cir. 2004) (recognizing violation where state's actions "portend [ ] . . . unjustified institutional isolation" (internal quotation marks omitted)); *Fisher v. Okla. Health Care Auth.*, 335 F.3d 1175, 1181-82 (10th Cir. 2003) (holding that *Olmstead* does not require a disabled person to submit to institutionalization when "imperiled with segregation" due to a state policy).  The plaintiffs have pleaded facts that demonstrate that even though they are not currently institutionalized, deprivation of nighttime services likely would lead to more restrictive living circumstances.

In *Olmstead*, the plaintiffs were deemed suitable to receive treatment under one of Georgia's community-based Medicaid programs.  *Olmstead*, 527 U.S. at 593.  Nonetheless, the plaintiffs remained in institutional care.  *Ibid*.  As noted above, the Court found that failure to place the plaintiffs into an existing community-based program could properly be regarded as discrimination based on disability.  The controversy in *Olmstead* concerned "'*where* Georgia should provide

-29-

treatment, not whether it must provide it.'" *Townsend v. Quasim*, 328 F.3d 511, 517 (9th Cir. 2003) (quoting *Rodriguez v. City of New York*, 197 F.3d 611, 619 (2d Cir. 1999) (emphasis in original). "[W]here the issue is the *location* of services, not *whether* services will be provided, *Olmstead* controls." *Ibid.* (emphasis in original).

Although "the ADA cannot and does not 'require[ ] States to provide a certain level of benefits to individuals with disabilities,' it can and does require states to 'adhere to the ADA's nondiscrimination requirement with regard to the services they in fact provide.'" *Davis*, 821 F.3d at 264 (quoting *Olmstead*, 527 U.S. at 603 n.14 (marks in original). In *Davis*, for example, New York was providing orthopedic footwear and compression stockings to some Medicaid recipients, but not to others based on a narrow range of qualifying conditions. *Id.* at 237. The Second Circuit concluded that as long as New York was providing coverage for orthopedic footwear and compression stockings under its Medicaid plan, it could not "deny such services only to certain disabled beneficiaries, with the effect of placing those disabled persons at substantial risk of institutionalization, because such a denial subjects plaintiffs to unjustified isolation on the basis of their disabilities in violation of the integration mandate." *Id.* at 264. The *Davis* panel concluded that the plaintiffs were entitled to summary judgment on their *Olmstead* claim. *Ibid.*

Here, the plaintiffs argue that the reduction of nighttime supervisory care puts them at serious risk of requiring institutionalized care in violation of Title II of the ADA and section 504 of the Rehabilitation Act. They argue that the purpose of CLS is to maintain self-sufficiency and that they require the nighttime supervision in order to remain self-sufficient. Additionally, they argue that billing codes suggest that supervision while consumers are sleeping is an allowable benefit, provided to some but not to them.

-30-

The defendants maintain that the plaintiffs have misread the billing codes, and that CLS services cannot be furnished to consumers while they are sleeping.  Nonetheless, the plaintiffs' allegations are sufficient to state a claim under *Olmstead*'s interpretation of Title II's mandate. Regardless of how the billing codes are interpreted, the plaintiffs have alleged that nighttime CLS services can be provided under the Michigan Medicaid Provider Manual, an allegation that was given a boost by the latest administrative decision.  The plaintiffs' claim under Title II of the ADA, at least insofar as it seeks injunctive and declaratory relief, is not subject to dismissal at this stage of the case.

### G.  Rehabilitation Act Claim

The plaintiffs also bring claims under section 504 of the Rehabilitation Act of 1973.  Like Title II of the ADA, section 504 of the Rehabilitation Act states that "no otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."  29 U.S.C. § 794(a).

> The elements of a cause of action under Section 504 are as follows: (1) The plaintiff is a "handicapped person" under the Act; (2) The plaintiff is "otherwise qualified" for participation in the program; (3) The plaintiff is being excluded from participation in, being denied the benefits of, or being subjected to discrimination under the program solely by reason of his handicap; and (4) The relevant program or activity is receiving Federal financial assistance.

*Doherty v. S. Coll. of Optometry*, 862 F.2d 570, 573 (6th Cir. 1988).

These elements (save the last one) essentially mirror those required for a claim under Title II of the ADA.  Other than section 504's "limitation to denials of benefits 'solely' by reasons of disability and its reach of only federal funded entities, the reach and requirements of both statutes are precisely the same." *S.S. v. Eastern Kentucky*, 532 F.3d 445, 452-53 (6th Cir. 2008).  Neither of

-31-

these differences apply to the present cases.  Therefore, it is appropriate to conclude that the analysis of the ADA claim applies with equal force to the plaintiffs' Rehabilitation Act claims.  *See id.* at 453 (citing *Thompson v. Williamson County*, 219 F.3d 555, 557 n.3 (6th Cir. 2000); *Maddox v. Univ of Tenn.*, 62 F.3d 843, 846 n.2 (6th Cir. 1995)).

For the reasons discussed above, the plaintiffs have stated viable claims under section 504 of the Rehabilitation Act.

### III.  Preliminary Injunction Motion

The plaintiffs' motions for a preliminary injunction ask the Court to order the defendants to restore their nighttime CLS services.  As noted above, the Mitchells have obtained that relief already through the state administrative appeal process.  Under Article III, § 2, clause 1 of the Constitution, federal courts may entertain only actual cases or controversies, "and thus 'have no power to adjudicate disputes which are moot.'" *Witzke v. Brewer*, 849 F.3d 338, 340 (6th Cir. 2017) (quoting *McPherson v. Mich. High Sch. Athletic Ass'n, Inc.*, 119 F.3d 453, 458 (6th Cir. 1997) (en banc)).  "[A]n actual controversy must be extant at all stages of review, not merely at the time the complaint is filed." *Arizonans for Official English v. Arizona*, 520 U.S. 43, 67 (1997) (quoting *Preiser v. Newkirk*, 422 U.S. 395, 401 (1975)).  Because the Mitchells have received the prospective relief they seek, "'there is nothing for [this court] to remedy,'" Witzke, 849 F.3d at 342 (quoting *Spencer v. Kemna*, 523 U.S. 1, 18 (1998)), and their request for an injunction is moot.

The Hartshornes have not obtained such relief; in fact, they have not even pursued their remedies through the administrative appeal procedures.  When considering whether to issue a preliminary injunction, the court weighs these factors: "(1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury absent

the injunction; (3) whether the injunction would cause substantial harm to others; and (4) whether the public interest would be served by the issuance of an injunction." *Bays v. City of Fairborn*, 668 F.3d 814, 818-19 (6th Cir. 2012) (citing *Certified Restoration Dry Cleaning Network, LLC v. Tenke Corp.*, 511 F.3d 535, 542 (6th Cir. 2007)).

The Sixth Circuit has held that, "'despite the overall flexibility of the test for preliminary injunctive relief, and the discretion vested in the district court, equity has traditionally required a showing of irreparable harm before an interlocutory injunction may be issued.'" *Nat'l Viatical, Inc. v. Universal Settlements Int'l, Inc.*, 716 F.3d 952, 957 (6th Cir. 2013) (internal marks omitted) (quoting *Friendship Materials, Inc. v. Mich. Brick, Inc.*, 679 F.2d 100, 103 (6th Cir. 1982)). Plaintiffs seeking a preliminary injunction must "demonstrate that irreparable injury is *likely* in the absence of an injunction." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (citing cases). To satisfy that requirement, the plaintiffs must articulate the danger of an injury "for which no adequate legal remedy is available." *City of Parma, Ohio v. Levi*, 536 F.2d 133, 135 (6th Cir. 1976) (citing *Detroit Newspaper Publishers Ass'n v. Detroit Typographical Union No. 18, Int'l Typographical Union*, 471 F.2d 872, 876 (6th Cir. 1972).

"The party seeking a preliminary injunction bears the burden of justifying such relief." *McNeilly v. Land*, 684 F.3d 611, 615 (6th Cir. 2012). The Hartshornes have not met that burden. It is abundantly clear from the present record that the state has put in place "elaborate procedures" through which aggrieved Medicaid claimants may challenge the denial or curtailment of benefits. *See Shoemaker*, 795 F.3d at 559. For reasons of their own, the Hartshornes have chosen to bypass the state's administrative appeal process and seek injunctive relief in this Court instead. But the avoidance of that administrative remedy, which has been demonstrated to be more than adequate,

-33-

undercuts their claim that they are likely to suffer irreparable injury without an injunction from this Court.

"[P]reliminary injunctions are 'extraordinary and drastic remed[ies] . . . never awarded as of right.'" *Platt v. Bd. of Comm'rs on Grievances & Discipline of Ohio Supreme Court*, 769 F.3d 447, 453 (6th Cir. 2014) (quoting *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008)).  Because their failure of proof on this important factor tips the balance against this extraordinary remedy, the Hartshornes' motion for a preliminary injunction will be denied.

IV.  Conclusion

The plaintiffs have pleaded adequately claims based on 42 U.S.C. § 1983 and section 504 of the Rehabilitation Act, and for prospective and declaratory relief under Title II of the ADA. Although they have demonstrated thereby at least some likelihood of success on the merits, the Mitchells' request for a preliminary injunction is moot, and the Hartshornes have not made a sufficient showing to support their request for an injunction at this stage of the case.

Accordingly, it is **ORDERED** that the motions to dismiss by defendant Community Mental Health of Central Michigan [case no. 16-11605 dkt. #10; case no. 16-11607 dkt. #10] are **DENIED**.

It is further **ORDERED** that the motions to dismiss by the State defendants [case no. 16-11605 dkt. #12; case no. 16-11607 dkt. #12] are **DENIED**.

It is further **ORDERED** that the Mitchell plaintiffs' motion for a preliminary injunction [case no. 16-11605 dkt. #4] is **DENIED as moot**.

It is further **ORDERED** that the Hartshorne plaintiffs' motion for a preliminary injunction

-34-

[case no. 16-11607 dkt. #4] is **DENIED**.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated:   March 22, 2017

---

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served
upon each attorney or party of record herein by electronic means or first
class U.S. mail on March 22, 2017.

s/Susan Pinkowski
SUSAN PINKOWSKI